[No. S014461. July 22, 1991.]

TIMES MIRROR COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
THE STATE OF CALIFORNIA et al., Real Parties in Interest.

COUNSEL

Gibson, Dunn & Crutcher, Stephen J. Burns, Rex S. Heinke, Ragnhild Reif, Kelli L. Sager and Karen N. Fredericksen for Petitioner.

Pillsbury, Madison & Sutro, Edward P. Davis, Jr., Kevin M. Fong and Judy Alexander as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Robert L. Mukai, Chief Assistant Attorney General, N. Eugene Hill, Assistant Attorney General, Richard M. Frank, Cathy A. Neff and Ted Prim, Deputy Attorneys General, for Real Parties in Interest.

De Witt W. Clinton, County Counsel (Los Angeles), and David L. Muir, Deputy County Counsel, as Amici Curiae on behalf of Real Parties in Interest.

OPINION

ARABIAN, J.—This case arises out of a dilemma inherent in the very nature of a free and open society. An informed and enlightened electorate is essential to a representative democracy. Yet even democratic governments

require some degree of confidentiality to ensure, among other things, a candid exchange of ideas and opinions among responsible officials. This tension inevitably leads to conflict, and conflict invariably leads to the courthouse.

The question before us is whether, under the California Public Records Act (Gov. Code, § 6250 et seq.; hereafter the Act),[1] the Governor of the State of California (Governor) properly refused a request to disclose his daily, weekly and monthly appointment calendars and schedules. For the reasons set forth below, we conclude that the records were properly withheld.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 1988, a reporter for the Los Angeles Times (Times) wrote the Governor requesting, under the Act, copies of his "appointment schedules, calendars, notebooks and any other documents that would list [the Governor's] daily activities as governor from [his] inauguration in 1983 to the present." The Governor's legal affairs secretary responded that the information requested was exempt from disclosure under section 6254, subdivision (*l*) as "correspondence of and to the Governor or employees of the Governor's office . . . ."[2]

After its request to reconsider this decision was denied, the Times filed suit seeking injunctive and declaratory relief to obtain disclosure of the materials requested. In opposition, the Governor claimed that the records came within the correspondence exemption of section 6254, subdivision (*l*), as well as the public interest exemption of section 6255, which applies when the public interest in nondisclosure "clearly outweighs" the public interest in disclosure.[3] Specifically, the Governor claimed that release of his appointment calendars and schedules would (1) create a risk to his personal security, and (2) inhibit the free and candid exchange of ideas necessary to the decisionmaking process.

In support of his opposition, the Governor submitted several declarations explaining the process by which his appointment calendars and schedules

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] Section 6254, subdivision (*l*) exempts from disclosure under the Act: "Correspondence of and to the Governor or employees of the Governor's office or in the custody of or maintained by the Governor's legal affairs secretary, provided that public records shall not be transferred to the custody of the Governor's legal affairs secretary to evade the disclosure provisions of this chapter."

[3] Section 6255 provides in full: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under the express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

are created, the function they serve, and the implications of their public disclosure. Susan Pederson, the Governor's scheduling secretary, explained that after reviewing requests for meetings and invitations, she drafts a "scheduling memorandum" which is then reviewed with four senior staff members of the Governor's office. A final scheduling memorandum and a "tentative month-long calendar" are then prepared in consultation with the Governor; the calendar "is a schematic representation of engagements and meetings discussed in the scheduling memorandum." Thereafter, a finished month-long calendar is produced which identifies the Governor's "major time commitments for public appearances and private meetings." Copies of this calendar are given to the Governor, a "limited number" of members of the Governor's office, the Director of Finance, the Governor's security director and those responsible for the Governor's transportation.

Each week the scheduling secretary also formulates a schedule for the two upcoming weeks, which incorporates information from the monthly calendar as well as more recently approved appointments and appearances. The schedule for the first week is designated "final," and that for the second is designated "advance." Lastly, a complete daily schedule is prepared on the afternoon or evening prior to each working day; the daily schedule "accounts for all the Governor's time from his departure from home in the morning until his departure from the office in the evening." The two-week and daily schedules are distributed to the same persons as the monthly calendar. According to Ms. Pederson, all persons receiving the monthly, two-week and daily schedules "do so with the understanding that they are to treat the schedule[s] and any accompanying material as confidential, and destroy the schedule once they have completed their use of it."[4] Ms. Pederson did not indicate in her declaration whether or to what extent copies of the final calendars and schedules are normally retained by herself, the Governor or anyone else in the Governor's office.[5]

The level of detail set forth in the daily and two-week schedules is exhaustive. Each reflects, for example, "the timing and details of the Governor's arrivals and departures everywhere he goes in the course of his day

---

[4] Ms. Pederson stated in her declaration that the daily schedules frequently include attachments in the nature of briefing memoranda to acquaint the Governor with the particulars of individual meetings, appearances or functions. To the extent such attachments actually contain advisory opinions, the Times indicated in its briefing that it did not seek disclosure of these documents.

[5] Although the record is unclear, it appears that the Governor does retain superseded appointment calendars and schedules. While this matter was pending, the Times moved for an order barring the Governor from transferring any of the requested records to the State Archives and placing a limitation on public access, pursuant to section 6268. The Governor filed an opposition to the motion. We granted the motion to preserve the subject matter of the litigation pending final determination of the appeal.

. . . whether and when family members and traveling companions will be with him, the particular aircraft or other means of transportation to be used, names of pilots and drivers, airport gate departures, specific hotel accommodations, [and] automobile and other ground arrangements." Thus, according to Ms. Pederson, the schedules and calendars necessarily reflect the daily "patterns and habits of the Governor," including the occasions "when he is likely to be alone."

Dennis Williams, the director of security for the Governor, also submitted a declaration. According to Mr. Williams, disclosure of the Governor's schedule "at any time in advance of the period to which they pertain would seriously impair the ability of [his] office to assure the Governor's security, and would constitute a potential threat to the Governor's safety, because the information they contain will enable the reader to know in advance and with relative precision when and where the Governor may be found, those persons who will be with him, and when he will be alone." Even disclosure of outdated schedules would pose a a security risk, in Mr. Williams's opinion, because they would "enable the reader to discern characteristic habits and activity patterns followed by the Governor, from which opportunities for access to the Governor's person may be surmised."

The Governor also submitted a declaration in support of his opposition to the Times complaint. In it he asserted that disclosure of his calendars and schedules would "be detrimental to the substantial public interest now served by protection of the confidential decisionmaking processes of [his] office . . . ." He explained that he had always considered his schedules and calendars to be confidential and had required his advisors to treat them as such, "because of the essential character of many of the meetings and appointments reflected in these papers, because of the decision making reflected in . . . these papers, and because of concerns pertaining to security."

Elaborating upon the potentially adverse consequences of disclosure on the decisionmaking process, the Governor noted that his office requires him to meet with people of wide-ranging views on a multiplicity of subjects. Because of the frequent sensitivity of the subjects under discussion, "it is necessary," he stated, "that the meetings themselves be fundamentally private, so that those present may feel free to express their candid opinions to me and so that I can be assured of the candor of their expressions . . . ." Routine disclosure of the identities of the persons with whom the Governor meets, he asserted, would inhibit the deliberative process, in some instances by discouraging persons from attending meetings, in others by leading to unwarranted inferences about the subject under discussion. Furthermore, the Governor argued, although the calendars and schedules contain "facts"

rather than opinions or advice, they necessarily reflect the Governor's "deliberative judgment" as to those persons, issues or events he considers to be of sufficient significance to occupy his time, and those he does not. Thus, the Governor claimed that disclosure of his calendars and schedules could substantially impair the quality of his decisions and the decisionmaking process of his office.

The Times's motion for injunctive and declaratory relief was heard on November 22, 1988. Following the hearing, the trial court denied the Times's motion for injunctive relief as well as its request for an in camera review, finding that the records were exempt from disclosure for each of the reasons urged by the Governor. However, the Court of Appeal reversed, holding that the records did not constitute correspondence under the Act; that disclosure would not implicate the deliberative process of government "because information relating to the content of meetings is not sought"; and that any security risk to the Governor, however slight, could not be evaluated without examining the documents themselves. Accordingly, the Court of Appeal remanded to the superior court "for an in camera review, segregation of any information posing a legitimate security risk, and disclosure of all nonexempt material."

Because we agree with the trial court that the public interest in not disclosing the records clearly outweighs the public interest in disclosure (§ 6255), we shall reverse the judgment of the Court of Appeal.

DISCUSSION

A. *Scope of Review*

Before turning to the merits, we address a threshold issue concerning the applicable scope of review. Relying on section 6259, subdivision (c) and *Freedom Newspapers, Inc.* v. *Superior Court* (1986) 186 Cal.App.3d 1102 [231 Cal.Rptr. 189] (hereafter sometimes *Freedom Newspapers*), the Attorney General contends the Times can prevail only if the trial court acted in excess of its jurisdiction. An erroneous interpretation of the Act, abuse of judicial discretion or lack of substantial evidence to support the judgment would not, he asserts, justify reversal of the trial court's decision. We disagree.

Prior to 1984, review of a trial court order either directing disclosure of a public record or refusing disclosure was by appeal. In 1984, however, the Legislature substituted a writ procedure for the appellate process by amending section 6259 to provide as follows: "In an action filed on or after January 1, 1985, an order of the court, either directing disclosure by a

public official or supporting the decision of the public official refusing disclosure, is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of the extraordinary writ of review as defined in Section 1067 of the Code of Civil Procedure." (§ 6259, subd. (c); Stats. 1984, ch. 802, § 1, pp. 2804-2805.)[6] Section 1067 of the Code of Civil Procedure states: "The writ of certiorari may be denominated the writ of review."

In *Freedom Newspapers, Inc.* v. *Superior Court, supra,* 186 Cal.App.3d 1102, the Court of Appeal considered the scope of review available under a writ of review filed pursuant to section 6259, subdivision (c). In that case, a newspaper had filed a public-records request for certain information concerning fees paid to court-appointed lawyers and investigators in an ongoing murder case. The trial court denied the request, holding that the public interest in nondisclosure—the defendant's right to a fair trial—outweighed any public interest in disclosure.

The Court of Appeal affirmed, despite the majority's view that the ruling was erroneous. Citing the seminal cases of *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715], and *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 454 [20 Cal.Rptr. 321, 369 P.2d 937], the court noted that the granting of a writ of review or certiorari is generally confined to circumstances in which the trial court has exceeded its jurisdiction, either in the fundamental sense that it lacks power over the person or subject matter of the litigation, or in the broader sense that its act exceeds the defined power of the court, whether that power be defined by the Constitution, a statute, or a court-developed rule under the doctrine of stare decisis. By that standard, the Court of Appeal concluded,

---

[6] As noted, *post,* at page 1335, the Legislature recently amended section 6259, subdivision (c) to provide: "In an action filed on or after January 1, 1991, an order of the court, either directing disclosure by a public official or supporting the decision of the public official refusing disclosure . . . shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." (Stats. 1990, ch. 908, § 2, No. 5 Deering's Adv. Legis. Service, p. 3265.)

We requested briefing at oral argument on the question whether that portion of section 6259, subdivision (c), prohibiting review by appeal contravenes article VI, section 11 of the California Constitution, which confers appellate jurisdiction upon the Courts of Appeal over every cause as to which the "superior courts have original jurisdiction." The Attorney General, on behalf of the Governor, submits that section 6259, subdivision (c) is constitutional. Times Mirror does not take a clear position, but appears to view the statute as constitutionally valid, as well. While the question is an interesting one, we need not decide it in this case. Whatever the merits of the provision purporting to preclude review by appeal, we discern no constitutional impediment to the Legislature providing, as it has here, an avenue of relief by means of writ review. As noted above, we interpret the statute to permit review of a trial court order on the merits.

the trial court had not exceeded its jurisdiction as no statute, constitutional provision or clearly controlling precedent based on the Act compelled a contrary result. (*Freedom Newspapers, supra,* 186 Cal.App.3d at p. 1109.)

The Court of Appeal in this matter purported to distinguish *Freedom Newspapers* on the ground that the trial court's decision in the latter case was merely "arguably incorrect," while the lower court's ruling here was "fundamentally erroneous" under settled law. The distinction is not persuasive. As discussed in the following section, the question of access to the Governor's personal calendars and schedules is a difficult and unsettled legal issue; whatever its substantive merits, nothing in the record suggests that the trial court's decision constituted an act in excess of jurisdiction. (*Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d at p. 288.)

Nevertheless, we are not persuaded that our scope of review is as limited as the Governor urges or as the *Freedom Newspapers* court concluded. Both assume that by use of the term "writ of review" the Legislature clearly and unambiguously intended to preclude review of lower court orders on the merits. That assumption is unwarranted. Apart from providing for issuance of the extraordinary writ of review as defined in section 1067 of the Code of Civil Procedure, which merely states that "writ of review" may be used as an alternative to writ of certiorari, section 6259, subdivision (c) is silent as to the scope of review to be accorded orders under the Act.

To be sure, the writ of review is traditionally limited to acts in excess of jurisdiction. (*Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 228.) ██ ██ ██ ██ ██ However, the legislative history of the 1984 amendment to section 6259, subdivision (c) reveals that the exclusive purpose of the amendment was to *speed* appellate review, not to *limit* its scope.[7] The bill which contained the amendment, Senate Bill No. 2222, 1983-1984 Regular Session, was sponsored by a news organization, the California Newspaper Publishers' Association. It was inspired by a case in which a newspaper had successfully sued in the superior court to obtain

---

[7]The Governor argues that the text of section 6259, subdivision (c) is clear and unambiguous and therefore cannot be construed in light of its legislative history. We disagree. As noted above, the statute does not squarely set forth a standard of review. Thus, the language is not altogether clear and unambiguous. Moreover, while ambiguity is generally thought to be a condition precedent to interpretation, this is not always the case. "The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689]; accord *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049] ["Once a particular legislative intent has been ascertained, it must be given effect ' "even though it may not be consistent with the strict letter of the statute." ' "]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].)

government records, but was forced to wait several years while the case was on appeal, by which time the story was no longer newsworthy.

The perceived evil at which the bill was aimed, according to a Senate Judiciary Committee analysis, was "delays of the appeal process, [by means of which] public officials are frustrating the intent of the laws for disclosure . . . ." "The sponsors of this bill," the analysis continued, "seek to correct an injustice they perceive due to . . . the potential for . . . public agencies to delay the disclosure of public documents." Accordingly, the amendment's goal was "to prohibit public agencies from delaying the disclosure of public records by appealing a trial court decision and using continuances in order to frustrate the intent of the Public Records Act." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2222 (1983-1984 Reg. Sess.).)

The synopsis of the bill prepared for the Assembly Committee on the Judiciary was to the same effect: "The bill is intended to expedite appellate review of judicial rulings relating to the withholding of public records by providing for the review to be by petition for issuance of a writ rather than by appeal." Although the Assembly analysis noted that writ review might occasionally result in a summary denial rather than an adjudication on the merits, there is no indication that the Legislature intended to *preclude* review on the merits altogether in every case. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 2222 (1983-1984 Reg. Sess.) Aug. 6, 1984.)

Moreover, we believe such an interpretation to be more fully in accord with the Act's express purpose of *broadening* the public's access to public records. (*CBS, Inc.* v. *Block* (1986) 42 Cal.3d 646, 651 [230 Cal.Rptr. 362, 725 P.2d 470].) There is no indication that the Legislature, in amending section 6259, intended sub silentio to shelter trial court orders, particularly those denying disclosure of public records, from appellate oversight. Nor, in light of our responsibility to avoid absurd results (*County of Sacramento* v. *Hickman, supra,* 66 Cal.2d at p. 849, fn. 6), can we believe that the Legislature could have intended the chaos which might otherwise result from a construction of the statute disallowing review on the merits of conflicting decisions in the trial courts.

Finally, we note that effective January 1, 1991, the Legislature has provided that orders under the Act "shall be immediately reviewable by petition to the appellate court for issuance of an extraordinary writ." (§ 6259, subd. (c); Stats. 1990, ch. 908, § 2.) The amendment also added two new provisions: (1) the petition for extraordinary writ must be filed within ten days after receipt of notice of the trial court order, and (2) no stay of the trial court order shall be permitted "unless the petitioning party demon-

strates it will otherwise sustain irreparable damage and probable success on the merits." (*Ibid.*)

The effect of the 1990 amendment providing for review by "extraordinary writ," including presumably writ of mandate, is, of course, to make it plain that review of orders subject to the amendment is not confined to acts in excess of jurisdiction. The analysis of the bill prepared for the Assembly Committee on the Judiciary indicates that the recent amendment was a response to *Freedom Newspapers, Inc.* v. *Superior Court, supra,* 186 Cal.App.3d 1102, and was intended to overrule that decision by "clarifying" that the purpose of writ review is to speed appellate review, not to preclude reviw on the merits. As the analysis explains, "[T]he courts [(an apparent reference to *Freedom Newspapers*)] . . . have narrowly interpreted [the 1984 amendment] to review questions of jurisdiction and not broader as intended by the original statute. This bill expands the extraordinary writ by *clarifying that courts can rule quickly on substantive issues.*" (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 2272 (1989-1990 Reg. Sess.), italics added.)

Thus, while logic and history support a broad interpretation, we need not ultimately determine the meaning of the 1984 amendment; its replacement makes plain the Legislature's intent that trial court orders under the Act shall be reviewable on their merits. As a practical matter, therefore, declining to reach the substantive issues presented here would only delay their resolution to a future day; judicial economy and the significance of the questions presented militate in favor of a decision sooner rather than later. Therefore, as we have in the past, we shall conduct an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence. (*CBS, Inc.* v. *Block, supra,* 42 Cal.3d at pp. 650-651.)

## B. *Disclosure of the Records*

We turn to the merits of the Times's request for disclosure of the Governor's appointment calendars and schedules from his inaugural to the date of the request, a period of approximately five years. As noted earlier, the Governor claimed that the records were exempt from disclosure on three separate grounds: the correspondence exemption set forth in section 6254, subdivision (*l*); the deliberative process privilege, as subsumed under the "public interest" exception of section 6255; and the threat to the Governor's personal security, also pursuant to section 6255.

### 1. *The Correspondence Exemption*

■ Section 6254, subdivision (*l*) exempts from operation of the Act "correspondence of and to the Governor or employees of the Governor's

office." Black's Law Dictionary defines "correspondence" as constituting, inter alia, the "[i]nterchange of written communications." (Black's Law Dict. (5th ed. 1979) p. 311.) Seizing on this broad definition, the Governor argues that his calendars and schedules constitute "written communications" between his scheduling secretary, his senior staff and himself, and thus fall within the scope of the exemption.

The Court of Appeal rejected the contention, however, ruling that Webster's definition of correspondence as "communication by letters" (Webster's New Collegiate Dict. (9th ed. 1984) p. 293) was more in conformity with the "ordinary import of the language" of the statute and the underlying legislative intent. (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 43 [127 Cal.Rptr. 122, 544 P.2d 1322].)

The Court of Appeal was correct. Prior to 1975, the Act exempted from disclosure *all* records "[i]n the custody of or maintained by the Governor or employees of the Governor's office employed directly in his office . . . ." (Stats. 1970, ch. 1295, § 1.5, p. 2397.) In 1975, this exemption was amended to limit the exemption to *correspondence* of or to the Governor and his staff. (Stats. 1975, ch. 1246, § 3, p. 3209.) "Where changes have been introduced to a statute by amendment it must be assumed the changes have a purpose . . . ." (*Louisiana-Pacific Corp.* v. *Humboldt Bay Mun. Water Dist.* (1982) 137 Cal.App.3d 152, 159 [186 Cal.Rptr. 833].)

The Governor's suggested definition of correspondence as "written communications" is so broad as to encompass nearly every document generated by the Governor's office, effectively reinstating the original exemption and rendering the 1975 amendment a nullity. Refining the definition, as the Governor suggests, to written communications "directed to an identifiable person or person for the purpose of establishing contact with the recipient," accomplishes little. Even under this definition, the exception would swallow the rule.

Therefore, we conclude that for purposes of the Act, the correspondence exemption must be confined to communications by letter. The Governor's appointment calendars and schedules plainly do not meet this definition, and therefore are not exempt from disclosure under section 6254, subdivision (*l*).

2. *The Public Interest Exemption*

 The Governor also asserts that his personal calendars and schedules are exempt from disclosure under section 6255, the so-called "public

interest" exemption. An understanding of the claim requires a brief discussion of the purposes and structure of the Act and the exceptions thereto.

The Act replaced a hodgepodge of statutes and court decisions relating to disclosure of public records. (*American Civil Liberties Union Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440, 447 [186 Cal.Rptr. 235, 651 P.2d 822]; Shaffer et al., *A Look at the California Records Act and Its Exemptions* (1974) 4 Golden Gate L.Rev. 203, 210-213.) Its preamble declares "that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250; *American Civil Liberties Union Foundation* v. *Deukmejian, supra,* 32 Cal.3d at p. 447.) In this and other respects the Act was modeled on its federal predecessor, the Freedom of Information Act (5 U.S.C. § 552 et seq.; hereafter FOIA), which was "broadly conceived" (*EPA* v. *Mink* (1973) 410 U.S. 73, 80 [35 L.Ed.2d 119, 128, 93 S.Ct. 827]) to require "full agency disclosure unless information is [statutorily] exempted . . . ." (*Federal Open Market Committee* v. *Merrill* (1979) 443 U.S. 340, 351 [61 L.Ed.2d 587, 598, 99 S.Ct. 2800].) The legislative history and judicial construction of the FOIA thus "serve to illuminate the interpretation of its California counterpart." (*American Civil Liberties Union Foundation* v. *Deukmejian, supra,* 32 Cal.3d at p. 447; *CBS, Inc.* v. *Block, supra,* 42 Cal.3d at p. 651.)

The Act sets forth numerous categories of records exempt from compelled disclosure. (§ 6254.) ■ In addition, section 6255 establishes a "catchall" exemption that permits the government agency to withhold a record if it can demonstrate that "on the facts of a particular case *the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record.*"

The Act does not specifically identify the public interests that might legitimately be "served by *not* making the record public" under section 6255. The nature of those interests, however, may be fairly inferred, at least in part, from the specific exemptions contained in section 6254. As one commentator has observed: "[S]ection 6255 was designed to act as a catchall for those individual records *similar in nature* to the categories of records exempted by section 6254, but which the Legislature determined, in balancing the competing interests, would not justify disclosure as a general rule . . . . [T]he provisions of section 6254 will provide appropriate indicia as to the nature of the public interest in nondisclosure and will thus aid the courts in determining the disclosability of a document under section 6255." (Note, *The California Public Records Act: The Public's Right of Access to Governmental Information* (1976) 7 Pacific L.J. 105, 119-120, italics added; see also *American Civil Liberties Union Foundation* v. *Deukmejian, supra,* 32 Cal.3d at p. 462 (conc. and dis. opn. of Bird, C. J.) ["The specific

exemptions of section 6254 are of considerable aid in ascertaining the Legislature's conception of 'the public interest served by not making [a] record public . . . . ' "].)

While the specific exemptions set forth in section 6254 may be helpful in identifying certain interests to be protected under section 6255, they are not exclusive. Nothing in the text or the history of section 6255 limits its scope to specific categories of information or established exemptions or privileges. Each request for records must be "considered on the facts of the particular case" in light of the competing "public interests." (§ 6255.)

■■ With these broad principles in mind, we turn to the question whether, on the facts presented, the public interest in nondisclosure of the Governor's appointment calendars and schedules "clearly outweighs" the public interest in disclosure of the records. (§ 6255.)

a. *The Deliberative Process Privilege*

(1) *The Public Interest in Nondisclosure*

Although not covered by the specific exemption for "preliminary drafts, notes, or . . . memoranda" set forth in section 6254, subdivision (a),[8] the Governor nevertheless contends that disclosure of his appointment schedules and calendars would jeopardize the decisionmaking or "deliberative process" which this exemption was designed to protect.[9] More specifically, he argues that disclosure of the records in question, which identify where, when and with whom he has met, would inhibit access to the broad spectrum of persons and viewpoints which he requires to govern effectively.

While state precedents relating to the deliberative process or "executive" privilege are relatively scarce, federal cases are abundant.[10] The FOIA

---

[8] Section 6254, subdivision (a) exempts "Preliminary drafts, notes, or interagency or intra-agency memoranda which are not retained by the public agency in the ordinary course of business, provided that the public interest in withholding such records clearly outweighs the public interest in disclosure . . . ."

[9] Although not cited by the Governor, we note that section 6254, subdivision (k) is also arguably relevant. That section exempts records "the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." Section 1040 of the Evidence Code establishes a privilege for "official information," defined as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (Evid. Code, § 1040, subd. (a).) Under subdivision (k) of section 6254, therefore, the instant records might arguably be exempt from disclosure pursuant either to the common law "mental process" (see fn. 11, *post*, at p. 1340) or the statutory "official information" privilege.

[10] The terms "executive privilege" and "deliberative process privilege" refer to the same concept and will be used interchangeably in this opinion. (See *Killington, Ltd.* v. *Lash* (Vt.

equivalent to section 6254, subdivision (a) is contained in exemption 5 (5 U.S.C. § 552(b)(5)).[11] As the United States Supreme Court has explained: "That Congress had the Government's executive privilege specifically in mind in adopting Exemption 5 is clear . . . . The cases uniformly rest the privilege on the policy of protecting the 'decision making processes of government agencies' . . . ." (*NLRB* v. *Sears, Roebuck & Co.* (1975) 421 U.S. 132, 150 [44 L.Ed.2d 29, 47, 95 S.Ct. 1504].)

In adopting exemption 5, Congress's main concern, made plain in a Senate Report, was that "frank discussion of legal or policy matters" might be inhibited if "subjected to public scrutiny," and that "efficiency of Government would be greatly hampered" if, with respect to such matters, government agencies were "forced 'to operate in a fishbowl.'" (*EPA* v. *Mink, supra,* 410 U.S. at p. 87 [35 L.Ed.2d at p. 132], quoting from Sen.Rep. No. 813, 89th Cong., 1st Sess., p. 9; *NLRB* v. *Sears, Roebuck & Co., supra,* 421 U.S. at p. 150 [44 L.Ed.2d at p. 47].) As the high court has observed in an analogous context: "Human experience teaches that those

1990) 572 A.2d 1368, 1371-1372, fn. 3; *Babets* v. *Secretary of Executive Office* (1988) 403 Mass. 230 [526 N.E.2d 1261, 1262, fn. 3].) It should be noted, however, that the term "executive" privilege as used here and by the federal courts interpreting the FOIA does not refer to whatever constitutional content the doctrine might have (see *United States* v. *Nixon* (1974) 418 U.S. 683 [41 L.Ed.2d 1039, 94 S.Ct. 3090]), but rather to the traditional common law privilege that attached to confidential intraagency advisory opinions, a privilege which was later codified in exemption 5. (*Kaiser Aluminum & Chemical Corp.* v. *United States* (Ct. Cl. 1958) 157 F.Supp. 939, 946 [141 Ct.Cl. 38]; *EPA* v. *Mink, supra,* 410 U.S. at pp. 86-87 [35 L.Ed.2d at pp. 131-132].)

The common law privilege protecting the "mental processes" of legislators is also well settled in California (see *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 772-773 [122 Cal.Rptr. 543, 537 P.2d 375]; *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 257-258 [115 Cal.Rptr. 497, 524 P.2d 1281]) although the analogous "deliberative process" privilege has not been litigated. Other states, however, have specifically held that a governor, in the discharge of official duties, is entitled to an executive privilege to protect the governor's internal mental or deliberative processes. (See, e.g., *Hamilton* v. *Verdow* (1980) 287 Md. 544 [414 A.2d 914, 922, 10 A.L.R.4th 333] [investigative report prepared for the Governor concerning a state mental hospital entitled to confidentiality to protect "deliberative communications between officials and those who assist them in formulating . . . governmental action."]; *Doe* v. *Alaska Superior Ct., Third Jud. Dist.* (1986 Alaska) 721 P.2d 617, 622-623 [Governor's file concerning a candidate for appointment to state office entitled to confidentiality under the executive privilege protecting "the deliberative and mental processes of decision-makers."]; *Nero* v. *Hyland* (1978) 76 N.J. 213 [386 A.2d 846, 853] [executive privilege protects character investigation report on candidate for state government prepared at the request of the Governor]; *Killington, Ltd.* v. *Lash, supra,* 572 A.2d at p. 1374 ["Both the constitutional and common-law roots of the [executive] privilege strongly require its recognition in Vermont" to protect, under the Vermont Access to Public Records statute, deliberative material in the possession of the Governor]; but cf. *Babets* v. *Secretary of Executive Office, supra,* 526 N.E.2d 1261 [Massachusetts high court refused to recognize executive privilege based on the common law or the state constitution to protect documents in the possession of the department of social services].)

[11] Title 5 United States Code section 552(b)(5) provides that agencies need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." (*United States* v. *Nixon, supra,* 418 U.S. at p. 705 [41 L.Ed.2d at p. 1062].)

To prevent injury to the quality of executive decisions, the courts have been particularly vigilant to protect communications to the decisionmaker before the decision is made. "Accordingly, the . . . courts have uniformly drawn a distinction between predecisional communications, which are privileged [citations]; and communications made after the decision and designed to explain it, which are not." (*NLRB* v. *Sears, Roebuck & Co., supra,* 421 U.S. at pp. 151-152 [44 L.Ed.2d at p. 48].) As Professor Cox in his seminal article on executive privilege has explained, protecting the predecisional deliberative process gives the chief executive "the freedom 'to think out loud,' which enables him to test ideas and debate policy and personalities uninhibited by the danger that his tentative but rejected thoughts will become subjects of public discussion. Usually the information is sought with respect to past decisions; the need is even stronger if the demand comes while policy is still being developed." (Cox, *Executive Privilege* (1974) 122 U.Pa.L.Rev. 1383, 1410.)

In determining whether a document falls within the parameters of exemption 5, the federal courts have also recognized "that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other." (*EPA* v. *Mink, supra,* 410 U.S. at p. 89 [35 L.Ed.2d at p. 133].) The courts have readily acknowledged, however, that the fact/opinion dichotomy may be misleading, and have refused to apply it in a mechanical or unthinking manner. The privilege, as one appeals court has written, "is intended to protect the deliberative *process* of government and not just deliberative *material*." (*Mead Data Cent., Inc.* v. *U.S. Dept. of Air Force* (D.C. Cir. 1977) 566 F.2d 242, 256 [184 App.D.C. 350], italics added; accord, *National Wildlife Federation* v. *U.S. Forest Serv.* (9th Cir. 1988) 861 F.2d 1114, 1118-119.) Accordingly, in some circumstances "the disclosure of even purely factual material may so expose the deliberative process . . . that it must be deemed exempted by [5 United States Code] section 552(b)(5)." (*Mead Data Cent., Inc.* v. *U.S. Dept. of Air Force, supra,* 566 F.2d at p. 256.) Decisions holding the exemption to be applicable even to "purely factual material" are legion. (See, e.g., *Montrose Chemical Corporation of California* v. *Train* (D.C. Cir. 1974) 491 F.2d 63, 67-71 [160 App.D.C. 270]; *Lead Industries Ass'n* v. *Occup. S. & H. Admin.* (2d Cir. 1979) 610 F.2d 70, 85-86 [60 A.L.R.Fed. 390]; *Ryan* v. *Department of Justice* (D.C. Cir. 1980) 617 F.2d 781, 790 [199 App.D.C. 199]; *Russell* v. *Department of the Air Force* (D.C. Cir. 1982) 682 F.2d 1045, 1048 [221

App.D.C. 96]; *Dudman Communications v. Dept. of Air Force* (D.C. Cir. 1987) 815 F.2d 1565, 1568 [259 App.D.C. 364]; *Wolfe v. Department of Health and Human Services* (D.C. Cir. 1988) (in bank) 839 F.2d 768, 774 [268 App.D.C. 89]; *National Wildlife Federation v. U.S. Forest Serv., supra,* 861 F.2d at pp. 1118-1119.)

In short, the courts' focus in exemption 5 cases is less on the nature of the records sought and more on the effect of the records' release. ■ The key question in every case is "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." (*Dudman Communications v. Dept. of Air Force, supra,* 815 F.2d at p. 1568.) Even if the content of a document is purely factual, it is nonetheless exempt from public scrutiny if it is "actually . . . related to the process by which policies are formulated" (*Jordan v. United States Dept. of Justice* (D.C. Cir. 1978) 591 F.2d 753, 774 [192 App.D.C. 144]) or "inextricably intertwined" with "policy-making processes." (*Ryan v. Department of Justice, supra,* 617 F.2d at p. 790; *Soucie v. David* (D.C. Cir. 1971) 448 F.2d 1067, 1078 [145 App.D.C. 144].)

■ Although the precise question presented here—whether the Governor may properly invoke the deliberative process privilege with respect to his appointment calendars and schedules—has not heretofore been adjudicated, any number of decisions offer useful points of comparison.[12] *Montrose Chemical Corporation of California v. Train, supra,* 491 F.2d 63,

---

[12]Several federal and state decisions have addressed the question whether a public official's personal appointment records and schedules constitute "agency records" within the meaning of the FOIA or its local counterpart. (See *Bureau of Nat. Affairs v. U.S. Dept. of Justice* (D.C. Cir. 1984) 742 F.2d 1484 [239 App.D.C. 331]; *Washington Post v. U.S. Dept. of State* (D.D.C. 1986) 632 F.Supp. 607; *Yacobellis v. City of Bellingham* (1989) 55 Wn.App. 706 [780 P.2d 272]; *Kerr v. Koch* (N.Y. 1988) 15 Media L.Rptr. 1579.) These cases have uniformly focused on whether the records relate to official agency business as opposed to purely private matters; none has addressed the question of executive privilege presented here, although one expressly left that issue open. (*Washington Post v. U.S. Dept. of State, supra,* 632 F.Supp. at p. 616 ["The Court's decision that the records of schedule are subject to disclosure does not limit the defendant's right to withhold portions of the documents under a valid claim of statutory exemption pursuant to the Act."].)

The Governor concedes that his appointment calendars and schedules constitute "public records" under the Act. (See § 6252, subd. (d) [" 'Public records' includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics. 'Public records' in the custody of the Governor means any writing prepared on or after January 6, 1975."].) It would be difficult indeed to argue to the contrary, inasmuch as the records clearly appear to "relat[e] to the conduct of the public's business." In any event, as noted, the Governor does not contend that the information sought lies outside the scope of the Act. He asserts, rather, that the records are exempt from disclosure under sections 6254, subdivision (*l*) and 6255.

for example, illustrates how the seemingly straightforward distinction between fact and opinion blurs when the facts themselves reflect on the deliberative process. In that case, the plaintiffs sought two summaries of evidence presented at a public hearing which had been prepared by staff for the Administrator of the Environmental Protection Agency. Although the summaries contained only factual material, the court of appeals nevertheless held that the deliberative process privilege applied. The documents revealed the authors' evaluative judgment as to the relative significance of the facts in the record; the plaintiffs were attempting to discover, in advance of the administrator's decision, what facts he considered to be important or unimportant. (*Id.* at pp. 67-70.) Thus, "[t]o probe the summaries of record evidence," the court concluded, "would be the same as probing the decision-making process itself." (*Id.* at p. 68; see also *Lead Industries Ass'n* v. *Occup. S. & H. Admin., supra,* 610 F.2d at p. 85 ["Disclosing factual segments from the [agencies'] summaries would reveal the deliberative process of summarization itself by demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker and those assisting her."]; *Washington Research Proj., Inc.* v. *Department of H., E. & W.* (D.C. Cir. 1974) 504 F.2d 238, 250-251 [164 App.D.C. 169] ["[T]he judgmental element arises through the necessity to select and emphasize certain facts at the expense of others."]; *Farmworkers Legal Services* v. *U.S. Dept. of Labor* (E.D.N.C. 1986) 639 F.Supp. 1368, 1373 ["Because the list sought here is composed of selective fact, it . . . could reveal the deliberative process."].)

The parallel here is evident. Disclosing the identity of persons with whom the Governor has met and consulted is the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment. The intrusion into the deliberative process is patent.

*Brockway* v. *Department of the Air Force* (8th Cir. 1975) 518 F.2d 1184 illuminates another pertinent facet of the issue before us. The father of an Air Force pilot sought disclosure of certain witnesses' statements concerning an airplane crash in which his son was killed. Although the information was factual rather than advisory in nature, the court nevertheless held that confidentiality was necessary to prevent " 'inhibition of the free flow of information' " to the Air Force. (*Id.* at p. 1193, quoting Note, *The Freedom of Information Act and the Exemption for Intra-Agency Memoranda* (1976) 86 Harv.L.Rev. 1047, 1052-1053.) "[W]ithout the assurances of confidentiality," the court concluded, the "flow of information to the Air Force" might be sharply curtailed, and the deliberative processes and efficiency of the agency greatly hindered. (518 F.2d at pp. 1193-1194.)

The reasoning of the federal court applies with equal force here. If the law required disclosure of a private meeting between the Governor and a politically unpopular or controversial group, that meeting might never occur. Compelled disclosure could thus devalue or eliminate altogether a particular viewpoint from the Governor's consideration. Even routine meetings between the Governor and other lawmakers, lobbyists or citizens' groups might be inhibited if the meetings were regularly revealed to the public and the participants routinely subjected to probing questions and scrutiny by the press.

In sum, while the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative. Accordingly, we are persuaded that the public interest in withholding disclosure of the Governor's appointment calendars and schedules is considerable.[13]

### (2) *Balancing the Interests*

■ Having so concluded, however, the lingering question nevertheless remains whether the public interest in nondisclosure "clearly outweighs" the public interest in disclosure. (§ 6255.) On the facts presented, we are persuaded that it does.

The Times asserts that, "in a democratic society, the public is entitled to know how [the Governor] performs his duties, including the identity of persons with whom he meets in the performance of his duties as Governor." Although the Times makes no effort to elaborate on this statement, its meaning is abundantly clear. In politics, access is power in its purest form. Entrance to the executive office is the passport to influence in the decisions of government. The public's interest extends not only to the individual they elect as Governor, but to the individuals their Governor selects as advisors.

One could readily imagine additional public benefits accruing from disclosure of the Governor's private itinerary, as well. It could be argued, for

---

[13] Our conclusion is not altered by the Times's subsequent willingness, expressed in its briefs and at oral argument, to exclude from disclosure any information relating to future events. The Times apparently believes that past events cannot qualify as "predecisional" and therefore do not merit protection under exemption 5 of the FOIA. (See *NLRB* v. *Sears, Roebuck & Co., supra,* 421 U.S. at pp. 151-152 [44 L.Ed.2d at pp. 47-48], and the discussion, *ante,* at page 1341.) As noted earlier, however, the question under section 6255 is not whether a document qualifies in every particular for protection under federal law, but whether the public interest in nondisclosure clearly outweighs the public interest in disclosure. Moreover, the risks of disclosure outlined above apply in many cases regardless of whether the meetings are past or future. Participants may be chilled and discouraged by the knowledge that a meeting will routinely be disclosed, and executive judgments in ongoing policy matters may be prematurely revealed. Indeed, the Times's dogged determination to obtain even past schedules and calendars of the Governor is telling testimony to their continued vitality and relevance to the decisionmaking process.

example, that the prospect of publicity would expand rather than contract the number and variety of persons meeting with the Governor. Disclosure might also reveal whether the Governor was, in fact, receiving a broad range of opinions, and ultimately whether the state's highest elected officer was attending diligently to the public business.

Moreover, in response to the assertion that disclosure could chill the flow of information to the executive office, one might argue, as the Court of Appeal concluded, that the Governor's advisors should be made of "sterner stuff"; we need not assume that the Governor, or those otherwise inclined to confer with the Governor, would be deterred by the mere specter of publicity.

The answer to these arguments is not that they lack substance, but pragmatism. The deliberative process privilege is grounded in the unromantic reality of politics; it rests on the understanding that if the public and the Governor were entitled to precisely the same information, neither would likely receive it. Politics is an ecumenical affair; it embraces persons and groups of every conceivable interest: public and private; popular and unpopular; Republican and Democratic and every partisan stripe in between; left, right and center. To disclose *every* private meeting or association of the Governor and expect the decisionmaking process to function effectively, is to deny human nature and contrary to common sense and experience. (See *United States* v. *Nixon, supra,* 418 U.S. at p. 705 [41 L.Ed.2d at p. 1062].)

Furthermore, whatever merit disclosure might otherwise warrant in principle is simply crushed under the massive weight of the Times's request in this case: the newspaper seeks almost five years of the Governor's calendars and schedules, covering undoubtedly thousands of meetings, conferences and engagements of every conceivable nature. We are not persuaded that any identifiable public interest supports such a wholesale production of documents.

Accordingly, on the present record, we conclude that the public interest in nondisclosure clearly outweighs the public interest in disclosure. (§ 6255.)

Lest there be any misunderstanding, however, we caution that our holding does not render inviolate the Governor's calendars and schedules or other records of the Governor's office. There may be cases where the public interest in certain specific information contained in one or more of the Governor's calendars is more compelling, the specific request more focused, and the extent of the requested disclosure more limited; then, the court might properly conclude that the public interest in nondisclosure does *not*

clearly outweigh the public interest in disclosure, whatever the incidental impact on the deliberative process. Plainly, that is not the case here.[14]

### b. *The Governor's Security Interest*

Our conclusion that the trial court properly denied the Times's request under the public interest exemption (§ 6255) finds additional support in the evidence relating to the potential threat to the Governor's physical security.

As noted earlier, the Governor's daily and weekly schedules set forth in exhaustive detail the particulars of the Governor's meetings and travel: time and location of arrivals and departures; traveling companions; hotel accommodations; and ground transportation. The revelation of such information, the Governor's security director reasonably asserts, "would seriously impair [his] . . . ability to assure the Governor's security, and would constitute a potential threat to the Governor's safety, because the information . . . will enable the reader to know in advance and with relative precision when and where the Governor may be found, those persons who will be with him, and when he will be alone." Confining disclosure to outdated calendars and schedules might mitigate but would not altogether eliminate the threat; it is plausible to believe that an individual intent on doing harm could use such information to discern activity patterns of the Governor and identify areas of particular vulnerability.

The Times argues that the Governor has, in effect, waived any security interest by voluntarily releasing "public schedules" for each coming week. The contention lacks merit. The "public schedules" set forth in the record reveal little more than the time and place of the Governor's scheduled public speaking engagements; they contain none of the specific details characteristic of his personal calendars and schedules.

Nor are we persuaded that the trial court erred, as the Times contends, in refusing to order an in camera review of the requested records to segregate information which might pose a legitimate security risk from other material, such as outdated schedules and calendars, which purportedly would not.

---

[14] In his dissenting opinion, Justice Mosk asserts that "secrecy is inconsistent with the duty of officials to keep the public informed of their activities . . ." and suggests that our holding represents a departure from both democratic principles and judicial precedent. On the contrary, express statutory and constitutional provisions recognize the need for confidentiality in governmental deliberations. Thus, it has been held that the activities of judges *under investigation* by the Commission on Judicial Performance—activities which the public would presumably be most interested in learning—are nevertheless not subject to disclosure pursuant to the provisions of article VI, section 18 of the California Constitution and for reasons of "sound public policy." (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 491, 499 [159 Cal.Rptr. 494, 601 P.2d 1030].)

As noted, the trial court could properly find, based on the declarations, that an individual intent on doing harm to the Governor might be able to reconstruct the Governor's daily habits and patterns using outdated schedules.[15]

CONCLUSION

"Give every man thy ear, but few thy voice," Shakespeare's Polonius advised.[16] Those in policymaking positions of government would do well to abide the admonition. Access to a broad array of opinions and the freedom to seek all points of view, to exchange ideas, and to discuss policies in confidence, are essential to effective governance in a representative democracy. Accordingly, we are persuaded, on the instant record, that the public interest served by not disclosing the Governor's appointment calendars and schedules clearly and substantially outweighs the public interest in their disclosure. (§ 6255.)

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Panelli, J., and Baxter, J., concurred.

**MOSK, J.,** Dissenting.—The dissent of Justice Kennard is irrefutable, and I agree completely with her opinion on the law. I write separately only on the issue of public policy.

Secrecy has always been deemed anathema to democratic government. Time and again justices of the Supreme Court have deplored secrecy in government. Justice Frankfurter declared that, "Secrecy is not congenial to truth seeking." (*Anti-Fascist Committee* v. *McGrath* (1951) 341 U.S. 123, 171 [95 L.Ed. 817, 854, 71 S.Ct. 624].) Justice Stevens wrote that, "Neither our elected nor our appointed representatives may abridge the free flow of information simply to protect their own activities from public scrutiny." (*Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 19 [92 L.Ed.2d 1, 17, 106 S.Ct. 2735].) Justice Douglas quoted Henry Steele Commager, the noted historian: " 'The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed

---

[15] Nor are we persuaded by the Times's contention that the trial court abused its discretion simply by failing to review the records in camera. Section 6259, subdivision (a), provides that the trial court may order disclosure where it appears that records are being improperly withheld, and states that "[t]he court shall decide the case after examining the record in camera, if permitted by subdivision (b) of Section 915 of the Evidence Code, papers filed by the parties and such oral argument and additional evidence as the court may allow." We have never construed this section to compel an in camera review where—as here—such review is unnecessary to the court's decision, and we decline to do so here.

[16] Hamlet, act I, scene 3.

itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to.'" (*EPA* v. *Mink* (1973) 410 U.S. 73, 105 [35 L.Ed.2d 119, 142, 93 S.Ct. 827].) Justice Douglas also quoted James Madison: "'A popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.'" (*Id.* at p. 110 [35 L.Ed.2d at p. 145].) Justice Brennan wrote that secrecy "can only breed ignorance and distrust" and that, conversely "free and robust reporting, criticism, and debate can contribute to public understanding . . . as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability." (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 587 [49 L.Ed.2d 683, 714, 96 S.Ct. 2791].) Justice Blackmun declared that information is necessary "'to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'" (*John Doe Agency* v. *John Doe Corp.* (1989) 493 U.S. 146, 152 [107 L.Ed.2d 462, 471, 110 S.Ct. 471, 475].)

Countless similar observations by justices and commentators could be cited. In short, the lessons of history tell us over and over that secrecy in government, *except as provided by law*, causes lack of public confidence and various other ills. We would do well to heed the words of Justice Brandeis: "sunlight is said to be the best of disinfectants."

Secrecy is inconsistent with the duty of public officials to keep the public informed of their activities, including the identity of those persons who have access to them. That this is not an unreasonable requirement is made clear on the national scene.

It is common knowledge that the schedule of the President of the United States is released to broadcast and print media by his press secretary every day, *in advance* of events. In contrast, the daily schedule of the Governor is shrouded in secrecy both before and long *after* the events have transpired, indeed permanently. It is difficult to rationalize justification for the Governor of this state being more furtive in his scheduling than the President of the United States. Certainly the problems of the state are not more significant, more potentially devastating, than those involving the nation's security and welfare with which the President is concerned.

It is true that the national media are requested not to release the President's schedule in advance of events. But, having been advised of the events and appointments, they are free to publish the information immediately

afterwards. Here the petitioner does not seek the Governor's schedule in advance, but only after the events and appointments have transpired.

Though the majority do not tell us, one must wonder whether under their theory this secrecy in scheduling applies not merely to the Governor but to the entire executive branch of our state government, to secretaries, cabinet officers, chairpersons of boards and commissions. And if it is a prerogative of the executive branch, does it also apply to county executives and local mayors? If we are not to be discriminatory, the secrecy pit is bottomless.

The majority, in their footnote 14, observe that the Commission on Judicial Performance conducts its investigations in confidence, pursuant to a constitutional provision. They make my point: if.there is to be governmental secrecy it must be pursuant to law. There is no statutory or constitutional provision specifically granting the right of secrecy to the Governor.

The conclusion is inescapable, as Justice Kennard declares in her discussion of the applicable law, that the judgment of the Court of Appeal should be affirmed.

Broussard, J., concurred.

**KENNARD, J.**—I dissent.

To support its holding that a governor's appointment calendars and schedules are exempt from disclosure, the majority relies primarily on the deliberative process privilege. Because the requested documents reveal the identity of those with whom a governor has met, the majority reasons that their disclosure would reveal "the substance or direction of the Governor's judgment and mental processes" (maj. opn., *ante*, p. 1343) or "devalue or eliminate altogether a particular viewpoint from the Governor's consideration" (maj. opn. *ante*, p. 1344) and thereby "chill the flow of information to the executive office" (maj. opn., *ante*, p. 1345). I am not persuaded.

The documents at issue disclose only the fact of meetings, not the contents of communications. With rare exceptions, the deliberative process is not compromised by disclosing merely the identity of the participants in policy discussions. Even assuming that the documents at issue contain some material protected by the deliberative process privilege, the government has not made the detailed and specific showing required to establish such a claim, and such protected matter, if it exists, could be easily segregated

from the bulk of the requested public records.[1] I conclude also that concerns about a governor's security do not warrant complete exemption of the requested records.

## I

The California Public Records Act (Gov. Code, § 6250 et seq.; hereafter the Act)[2] was modeled on the federal Freedom of Information Act (5 U.S.C. § 552; hereafter the FOIA). The purpose of both the Act and the FOIA is to require that public business be conducted "under the hard light of full public scrutiny" (*Tennessean Newspapers, Inc.* v. *Federal Housing Admin.* (6th Cir. 1972) 464 F.2d 657, 660), and thereby "to permit the public to decide *for itself* whether government action is proper" (*Washington Post Co.* v. *U. S. Dept. of Health, etc.* (D.C. Cir. 1982) 690 F.2d 252, 264, italics in original). The Act declares that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) For both the FOIA and the Act, "disclosure, not secrecy, is the dominant objective." (*Dept. of Air Force* v. *Rose* (1976) 425 U.S. 352, 361 [48 L.Ed.2d 11, 21, 96 S.Ct. 1592].)

Because the FOIA provided a model for the Act, and because they have a common purpose, the Act and its federal counterpart "should receive a parallel construction." (*American Civil Liberties Union Foundation* v. *Deukmejian* (1982) 32 Cal.3d 440, 451 [186 Cal.Rptr. 235, 651 P.2d 822].) Therefore, federal decisions under the FOIA may be used to construe the Act. (*Braun* v. *City of Taft* (1984) 154 Cal.App.3d 332, 342 [201 Cal.Rptr. 654]; *San Gabriel Tribune* v. *Superior Court* (1983) 143 Cal.App.3d 762, 772, 777 [192 Cal.Rptr. 415].)

It is undisputed that the Act protects the deliberative processes of government agencies and officials, but it is not clear whether it does so through subdivisions (a) or (k) of section 6254 (see maj. opn., *ante*, p. 1339, fns. 8 &

---

[1] It bears emphasis that a governor's appointment calendars and schedules are indeed public records. The government has conceded as much in this case, and courts have so held in regard to similar documents prepared for executive branch officials (*Washington Post* v. *U.S. Dept. of State* (D.D.C. 1986) 632 F.Supp. 607 [records of schedule of Secretary of State Alexander Haig]; *Bureau of Nat. Affairs* v. *U.S. Dept. of Justice* (D.D.C. 1984) 742 F.2d 1484, 1495 [239 App.D.C. 331] [daily agendas of Assistant Attorney General William Baxter]; *Kerr* v. *Koch* (N.Y. 1988) 15 Media L.Rptr. 1579 [appointment calendar of New York City mayor]).

As the majority points out (maj. opn., *ante*, p. 1342, fn. 12), in one of these cases the court remarked that its decision "does not limit the defendant's right to withhold *portions of the documents* under a valid claim of statutory exemption pursuant to the Act." (*Washington Post* v. *U.S. Dept. of State, supra,* 632 F.Supp. 607, 616, italics added.) None of the cases in any way suggests that calendars and schedules might be entirely exempt from disclosure.

[2] All further statutory references are to the Government Code, unless otherwise stated.

9), through section 6255, or through all of these. (See 53 Ops.Cal.Atty.Gen. 136 (1970).) The majority proceeds on the assumption that the Act protects the deliberative process through section 6255.[3] Although it would seem that the deliberative process privilege is more properly located in subdivision (a) of section 6254 (see *Citizens for a Better Environment* v. *Department of Food & Agriculture* (1985) 171 Cal.App.3d 704, 712 [217 Cal.Rptr. 504]), I will likewise assume, for purposes of this case only, that it may properly be asserted under section 6255.

The role of the deliberative process privilege under the FOIA has been well defined. The privilege is included within the ambit of what is commonly referred to in FOIA cases as exemption 5.[4] (See *EPA* v. *Mink, supra*, 410 U.S. 73, 85-86 [35 L.Ed.2d 119, 131-132].) Because the deliberative process privilege has been the subject of intense and careful scrutiny in the context of the FOIA, consideration of the cases and commentaries construing the federal legislation is crucial to a proper resolution of the issue presented here.

The deliberative process privilege protects an agency's internal working papers consisting of advice, recommendations, opinions, and other material reflecting deliberative or policymaking processes. (*Wu* v. *National Endowment for Humanities* (5th Cir. 1972) 460 F.2d 1030, 1034; *Soucie* v. *David* (D.C. Cir. 1971) 448 F.2d 1067, 1077 [145 App.D.C. 144].) Like all exemptions under both the FOIA and the Act (see *United States Dept. of Justice* v. *Julian, supra*, 486 U.S. 1, 8 [100 L.Ed.2d 1, 11]; *New York Times Co.* v. *Superior Court* (1990) 218 Cal.App.3d 1579, 1585 [268 Cal.Rptr. 21]), it is to be narrowly construed.

The privilege has three policy bases: "First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby,

---

[3] Section 6255 contains a residuary or "catchall" exemption. It provides: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter *or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record.*" (Italics added.) Note that this public interest exemption applies to individual records, rather than to entire classes of records.

[4] Exemption 5, which the United States Supreme Court has termed a "somewhat Delphic provision" (*United States Dept. of Justice* v. *Julian* (1988) 486 U.S. 1, 11 [100 L.Ed.2d 1, 13, 108 S.Ct. 1606]), permits an agency to withhold from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." (5 U.S.C. § 552(b)(5).) It was intended to incorporate the substance of certain privileges, including the deliberative process privilege, that would be available to the government during litigation to shield internal agency documents. (See *United States* v. *Weber Aircraft Corp.* (1984) 465 U.S. 792 [79 L.Ed.2d 814, 104 S.Ct. 1488].) The high court has cautioned, however, that discovery rules should be applied to FOIA cases only "by way of rough analogies." (*EPA* v. *Mink* (1973) 410 U.S. 73, 86 [35 L.Ed.2d 119, 131, 93 S.Ct. 827].)

improves the quality of agency policy decisions. Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon. And third, it protects the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided[,] not for matters they considered before making up their minds.'" (*Jordan* v. *United States Dept. of Justice* (D.C. Cir. 1978) 591 F.2d 753, 772-773 [192 App.D.C. 144], fns. omitted.) The ultimate purpose of the deliberative process privilege is "to prevent injury to the quality of agency decisions." (*NLRB* v. *Sears, Roebuck & Co.* (1975) 421 U.S. 132, 151 [44 L.Ed.2d 29, 47, 95 S.Ct. 1504].)

To qualify for exemption under the deliberative process privilege, a document or a portion of a document must be both predecisional and deliberative. (*NLRB* v. *Sears, Roebuck & Co., supra*, 421 U.S. 132, 151-154 [44 L.Ed.2d 29, 47-49]; *Mead Data Cent., Inc.* v. *U. S. Dept. of Air Force* (D.C. Cir. 1977) 566 F.2d 242, 257 [184 App.D.C. 350].) To establish that a document is predecisional, an agency must identify an agency decision or policy to which the document contributed (*Senate of Puerto Rico* v. *U.S. Dept. of Justice* (D.C. Cir. 1987) 823 F.2d 574, 585 [262 App.D.C. 166]), or at least must show "that the document is in fact part of *some* deliberative process" (1 Braverman & Chetwynd, Information Law (1985) § 9-4.3.1, p. 364, italics in original; *NLRB* v. *Sears, Roebuck & Co., supra*, 421 U.S. at p. 151, fn. 18 [44 L.Ed.2d at p. 48]).

In this case, the government has satisfied neither of these foundational requirements for invoking the deliberative process privilege.

First, the government has not shown that the documents are predecisional. It has not identified particular policies or decisions that resulted from particular meetings mentioned in the calendars and schedules or otherwise shown that the meetings were each part of some deliberative process. Indeed, it seems likely that many of the meetings were ceremonial occasions unrelated to any policy or decision, and that others consisted of explanation of policies already formulated or the formulation of plans and strategies for their implementation. The deliberative process privilege can have no application to such postdecisional or nondecisional meetings.

Second, the government has not shown that the documents are deliberative. To qualify as deliberative, a document generally must consist of opinions or recommendations. Purely factual material may be withheld only if it is "inextricably intertwined with policy-making processes" (*Soucie* v. *David, supra*, 448 F.2d 1067, 1077-1078, fn. omitted), if it would expose the deliberative process by the manner in which the factual material is

organized or presented (*Ryan* v. *Department of Justice* (D.C. Cir. 1980) 617 F.2d 781, 790 [199 App.D.C. 199]), or if it would compromise the agency's ability to gather information in the future (*Brockway* v. *Department of Air Force* (8th Cir. 1975) 518 F.2d 1184, 1191-1192).

The majority relies on an analogy between agency summaries of factual material, which are exempt from disclosure if they reveal the deliberative process by the manner in which material is summarized, and appointment calendars showing the persons with whom a high government official has met. The majority encapsulates this reasoning in the following sentence: "Disclosing the identity of persons with whom the Governor has met and consulted is the functional equivalent of revealing the substance and direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment." (Maj. opn., *ante*, p. 1343.)

The analogy is inapt. The selection of a fact for inclusion in a summary indicates clearly and directly that the person making the summary considers it important to the decision. But information that a governor has met or will meet with an individual on a particular date has no such unambiguous significance. Although disclosure of appointment calendars and schedules does provide glimpses into the inner workings of the governor's office, and thereby serves a substantial public interest, these glimpses are so indirect that they will injure the decisional process only in rare instances.

Consider first a list of the occasions on which a governor has met or will meet with members of his or her personal staff or with the heads of executive branch agencies. Without information as to both the topics discussed and the advice or opinions offered, such a list would reveal nothing about the status of the governor's thinking about "critical issues of the moment." Although information that a governor seldom or never meets with an agency director could signify that the governor has little confidence in the individual's advice (it could also indicate a preference for communication by telephone or written memorandum), it would disclose nothing about the substance of the governor's thinking on any issue and so would pose no threat of injury to the deliberative process.

Consider next a list of occasions on which a governor has met with persons outside state government. Although the list would not disclose the topics discussed or the advice or opinions expressed, these could sometimes be inferred if the persons with whom the governor met had publicly advocated particular positions on issues that required a decision by the governor. Even in these cases, however, information that the governor met with an

advocate for a particular position reveals little about how the governor is inclined to decide the issue. Governors do not meet only with advocates whose views they are inclined to favor. A governor may wish to test a tentative decision or inclination against the arguments of those advocating a different course, or the governor may choose to hear the opposing arguments as a matter of courtesy, political expediency, or public relations. And if a governor has met with representatives of all points of view, what can this possibly reveal about "the substance and direction of the Governor's judgment" as to the question at issue? Thus, information that a governor has met with an individual does not reveal the governor's judgment about the merits of the position the individual is advocating, and so poses no discernible threat of injury to the deliberative process.

On the other hand, there is a very substantial public interest in disclosure of the occasions on which a governor has met with persons outside government who seek to influence the governor's decisions on critical issues. This interest is reflected in the many decisions under the FOIA holding that the deliberative process privilege does not protect communications by interested parties seeking to influence government decisions. (*Van Bourg, Allen, Weinberg & Roger* v. *N.L.R.B.* (9th Cir. 1985) 751 F.2d 982, 985; *County of Madison, N. Y.* v. *U. S. Dept. of Justice* (1st Cir. 1981) 641 F.2d 1036, 1040-1042; *Mead Data Cent., Inc.* v. *U. S. Dept. of Air Force, supra,* 566 F.2d 242, 257-258; *NAACP Legal Defense Fund* v. *U.S. Dept. of Justice* (D.D.C. 1985) 612 F.Supp. 1143, 1146-1147; see also Weaver & Jones, *The Deliberative Process Privilege* (1989) 54 Mo.L.Rev. 279, 300; *Project: Government Information and the Rights of Citizens* (1975) 73 Mich.L.Rev. 971, 1071; Note, *The Freedom of Information Act: A Seven-year Assessment* (1974) 74 Colum.L.Rev. 895, 942; Note, *The Freedom of Information Act and the Exemption for Intra-agency Memoranda* (1973) 86 Harv.L.Rev. 1047, 1065.) The public interest in monitoring the activities of those who seek to gain private advantage by influencing government decisions is also reflected in the detailed regulatory system enacted to control the practice of lobbying. (§ 86100 et seq.)

Although the majority defends its holding with citation to *Brockway* v. *Department of Air Force, supra,* 518 F.2d 1184, examination of that decision exposes the weakness of the majority's position. The *Brockway* court held that the deliberative process privilege protects an agency document containing the statements of witnesses to an airplane crash. Yet in that case the agency voluntarily revealed the names of the witnesses it had interviewed. (*Id.* at p. 1186.) No claim was ever made that disclosing merely the fact of the interviews, as opposed to what was said, would harm the deliberative

process privilege.[5] (See also 8 Wright & Miller, Federal Practice and Procedure (1970) § 2019, pp. 160-161 ["Frequently statutes requiring particular kinds of reports to be made to government will provide that such reports are to be kept confidential. . . . The fact that a person has made a report of this kind is not privileged, even though the contents of the report may be."].)

Many other FOIA decisions also weigh heavily against the majority's conclusion. Under the FOIA, courts and commentators alike have concluded that the identities of persons who participate in the process of formulating policy within a governmental agency by giving opinions, advice, or recommendations are essentially factual rather than deliberative, and that disclosure of documents revealing the names of participants in policy formulation will not compromise the deliberative process.

For instance, in two cases in which it was alleged that the government had charged exorbitant prices for homes sold to low-income buyers, courts ordered disclosure of the identity of the appraisers on whom the government had relied. (*Tennessean Newspapers, Inc.* v. *Federal Housing Admin.*, *supra*, 464 F.2d 657; *Philadelphia Newspapers, Inc.* v. *Department of H. & U. D.* (E.D.Pa. 1972) 343 F.Supp. 1176.) One of these courts observed that the appraisers' names were outside the deliberative process privilege because names are "essentially factual." (*Philadelphia Newspapers, Inc.* v. *Department of H. & U. D.*, *supra*, at p. 1178.) The other court, recognizing the public's interest in disclosure of conflicts of interest, remarked that the "name of an appraiser could be sufficient to establish a motivation sufficient to trigger an investigation." (*Tennessean Newspapers, Inc.* v. *Federal Housing Admin.*, *supra*, at p. 660.)

In another case, a federal district court ordered the Federal Trade Commission to disclose the names of outside experts it had consulted during the process of formulating a regulation. The court stated: "The government has attempted to expand the policy of exemption 5—encouragement of a frank discussion of legal and policy matters in order to enhance the quality of agency decisions—beyond its necessary and proper limits. The FOIA

---

[5] Moreover, it seems unlikely that a governor's meetings would involve the kind of factual investigation at issue in *Brockway, supra*, 518 F.2d 1184, as such investigations are normally conducted at lower levels of the executive branch. If a governor did meet in confidence with an individual to acquire information, and disclosure of the meeting could jeopardize a governor's ability to acquire similar confidential information in the future, a claim of privilege should be recognized. (See 53 Ops.Cal.Atty.Gen., *supra*, 136, 149 ["The need of a governmental agency to preserve its informational input channels has been recognized by the courts and the Legislature in this State as vital to the efficient operation of government."].) But such instances must be quite rare, and the government bears the burden of identifying them to the extent they exist within the requested material, as discussed below in part III of this dissent.

'creates a liberal disclosure requirement, limited only by specific exemptions which are to be narrowly construed.' [Citation.] Outside expert consultants would not be chilled in their advice or recommendations to the agency if it were known that they had rendered advice. After all, as experts they are members of a profession which demands the rendition of advice to many groups. They should expect the fact of rendition to eventually become public. Protection of the content of the advice rendered would adequately serve the purpose of encouraging frank discussion, and therefore the names and addresses of the outside expert consultants will be ordered disclosed." (*Assn. of National Advertisers, Inc.* v. *FTC* (D.D.C. 1976) C.A.No. 75-1304, 1976-2 Trade Cas. (CCH) ¶ 61,021, pp. 69,491, 69,493; see also *Assn. of National Advertisers, Inc.* v. *FTC* (D.D.C. 1976) C.A.No. 75-0896, 1976-2 Trade Cas. (CCH) ¶ 61,112, pp. 70,041, 70,045.)

Commentators have reached the same conclusion: "A requirement that names be disclosed is supported in the most mechanical sense by the observation that names are factual and that factual material falls outside the ambit of the exemption's protection. More importantly, the same kind of policy analysis that underlies the factual material limitation of exemption (5) argues for disclosure of names. Few outside consultants would be discouraged from providing recommendations by the mere prospect that their names would be disclosed, without the content of their advice; indeed, the most likely cases for such discouragement are those of blatantly prejudiced potential consultants who would fear the public imputation of malice. And there is of course a public interest in knowing who is being consulted by the Government and contributing to its decisions." (Note, *The Freedom of Information Act and the Exemption for Intra-agency Memoranda, supra*, 86 Harv.L.Rev. 1047, 1065-1066, fn. omitted; see also O'Reilly, Federal Information Disclosure (1989) § 15.16, pp. 15-78 to 15-79.)

Disclosure of the identity of participants in policy formulation occurs routinely in FOIA cases. Often, the agency has made the disclosure voluntarily. (See, e.g., *Washington Post Co.* v. *U. S. Dept. of Heath, etc., supra*, 690 F.2d 252, 257.) In other cases, the trial court has mandated disclosure by requiring the agency to prepare a *Vaughn* index (named after *Vaughn* v. *Rosen* (D.C. Cir. 1973) 484 F.2d 820 [157 App.D.C. 340]), and to furnish the index to both the court and the requesting party.

A *Vaughn* index identifies the author, recipient, and subject matter of each document that the agency has withheld in whole or in part under a claim of exemption. (see *Osborn* v. *I.R.S.* (6th Cir. 1985) 754 F.2d 195, 196; Weaver & Jones, *op. cit. supra*, 54 Mo.L.Rev. 279, 301-302.) The purpose of the index is to give the court and the opposing party sufficient information about the withheld document, or portion of a document, to assess the

validity of the agency's exemption claim. (*Vaughn* v. *Rosen, supra*, 484 F.2d 820.) The government must provide a *Vaughn* index before the court makes its decision "in most FOIA cases." (*Osborn* v. *I.R.S., supra*, at p. 197.)

Although the participants in the process of policy formulation and rule-making are disclosed through the *Vaughn* indexes, this has not prevented the courts from making them a standard procedure in FOIA cases. Rather, the federal courts' continued use of the *Vaughn* index implies a determination that disclosing the names of agency employees who have authored internal documents, the contents of which are or may be privileged, will work no harm to an agency's deliberative process in the vast majority of cases. (See 1 Braverman & Chetwynd, *op. cit. supra*, § 9-4.3.2, at p. 371.)[6]

Because the schedules and calendars at issue disclose only the identity of persons who have met with the Governor, and not what was said at those meetings, the deliberative process privilege can have little, if any, application. The frank exchange of views is unlikely to be compromised by public knowledge of the occasions on which a governor has met in the past with other government officials, with particular members of the governor's personal staff, or with persons outside state government. The majority holding, under which documents containing the names of persons who might have participated in policy formulation may be withheld from the public, finds no support in the deliberative process privilege.

## II

The majority also relies to some extent on concern for a governor's physical safety. The government submitted evidence in the trial court that disclosure of former Governor Deukmejian's appointment calendars and schedules would have revealed his characteristic patterns of movement while in office and would have disclosed particular times when he would likely have been alone. The government argues that this information could be useful to a potential assailant, and that it therefore should be kept confidential.

This argument should be rejected. The government has not shown that disclosure of appointment calendars and schedules would elevate the risk above that which high public officials normally must accept. For example,

---

[6]There are specific exceptions to this general rule of disclosure. For example, it has twice been held that the identity of persons who rendered advice need not be disclosed when the content of their advice has already been made public and disclosure could discourage candid advice in the future. (*Tax Reform Research Group* v. *I.R.S.* (D.D.C. 1976) 419 F.Supp. 415, 423-424; *Wu* v. *Keeney* (D.D.C. 1974) 384 F.Supp. 1161, 1166.) Here, the government has not made the showing required to establish any such exception.

those elected to the Legislature must attend its public sessions, as judges must attend the public sessions of court. Although such public appearances, at preannounced times and places, carry a certain risk to the safety of legislators and judges, the risk is one that is deemed acceptable.[7] Greater safety for public officials might be obtainable at the cost of total secrecy in government, but the price would be unacceptably high.

## III

The government may be able to establish that *parts* of a governor's appointment calendars and schedules are exempt from disclosure under the Act, even though it has not established an exemption for these public records as a whole.

The public official or agency invoking an exemption bears the burden of establishing that it applies. (§ 6255; *Senate of Puerto Rico* v. *U.S. Dept. of Justice, supra,* 823 F.2d 574, 585; *Church of Scientology, etc.* v. *U. S. Dept.* (9th Cir. 1979) 611 F.2d 738, 742; *Braun* v. *City of Taft, supra,* 154 Cal.App.3d 332, 345.) To discharge its burden, an agency may not rely upon conclusory and generalized allegations. (*Senate of Puerto Rico* v. *U.S. Dept. of Justice, supra,* at p. 585; *Church of Scientology, etc.* v. *U. S. Dept., supra,* at p. 742.) Instead, it must provide a "detailed factual justification" for each exemption claim (*Washington Post Co.* v. *U. S. Dept. of Health, etc., supra,* 690 F.2d 252, 269; see also *Mead Data Cent., Inc.* v. *U. S. Dept. of Air Force, supra,* 566 F.2d 242, 258 [an agency "must show by specific and detailed proof that disclosure would defeat, rather than further, the purpose of the FOIA"]; *Black* v. *Sheraton Corporation of America* (D.D.C. 1974) 371 F.Supp. 97, 101 ["To recognize such a broad claim [of privilege,] in which the [government] has given no precise or compelling reasons to shield these documents from outside scrutiny, would make a farce of the whole procedure."].)

Although a heavy burden is thus imposed on a public official or agency seeking to avoid disclosure, the burden is not impossible to discharge. In this case, there may well be portions of the appointment calendars and schedules at issue that are protected by the deliberative process privilege, by the interest in protecting the Governor's safety, or by other important

---

[7]The schedules apparently contain detailed information about airport gate departures and arrivals, means of ground transportation, hotel accommodations, and the like. This level of detail may well elevate the risk above that which high government officials normally must accept, but the briefs of the requesting party reveal that it does not now seek such information and it could be deleted from the documents before disclosure. The essence of the request is for documents revealing the identity of the persons with whom former Governor Deukmejian met and the dates and times of the meetings.

public interests. For this reason, I agree with the Court of Appeal that the case should be remanded to give the government an opportunity to provide the detailed factual justification required to establish that portions of the schedules and calendars are exempt from disclosure. If a factual dispute remained after a sufficiently detailed justification had been provided, the proper procedure would have been for the trial court to conduct an in camera review of the documents, or at least of a representative sample. (See *EPA* v. *Mink, supra,* 410 U.S. 73, 93 [35 L.Ed.2d 119, 135]; *Church of Scientology, etc.* v. *U. S. Dept., supra,* 611 F.2d 738, 742.)

When the government succeeds in establishing that parts of requested documents are exempt, those portions are deleted and the rest disclosed. This is mandated by section 6257, which provides: "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt by law." (See also *Johnson* v. *Winter* (1982) 127 Cal.App.3d 435, 440 [179 Cal.Rptr. 585]; *Anderson* v. *Department of Health & Human Services* (10th Cir. 1990) 907 F.2d 936, 941.)

## IV

A former United States Attorney General has remarked: "Nothing would be so alien to our form of government as pervasive secrecy, for people cannot govern themselves if they cannot know the actions of their government. Yet it is elementary that the welfare of the nation and that of its citizens may require that some information be kept in confidence." (Richardson, *Freedom of Information* (1974) 20 Loyola L. Rev. 45.) The FOIA and the Act seek to accommodate these competing concerns by mandating a general policy of full disclosure, with specific and narrowly drawn exemptions.

To establish an exemption under section 6255, an agency must show "that on the facts of the particular case the public interest served by not making the record public *clearly outweighs* the public interest served by disclosure of the record." (Italics added.) When conducting this balancing process, the public's right to know what public officials are doing[8] provides "a heavy and constant weight" in favor of disclosure. (Comment, *The California Public Records Act: The Public's Right of Access to Governmental Information* (1976) 7 Pacific L.J. 105, 119; see also *Citizens for a Better Environment* v. *Department of Food & Agriculture, supra,* 171 Cal.App.3d

---

[8] The clearest and most emphatic expression of this right appears in section 54950: "The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created."

704, 715 ["If the records sought pertain to the conduct of the people's business there is a public interest in disclosure."].) The weight varies, however, in accordance with "the gravity of the governmental tasks sought to be illuminated and the directness with which the disclosure will serve to illuminate." (*Citizens for a Better Environment* v. *Department of Food & Agriculture, supra*, at p. 715.) How our state governors spend their working hours, and how they go about obtaining advice and formulating policy are matters of great public importance, and, as already noted, disclosure of the names of the persons with whom a governor has met during office hours will illuminate this subject in significant ways.

The public interest in secrecy has not been shown to clearly outweigh this interest in disclosure. The government has made no specific and detailed demonstration that the requested documents, and all reasonably segregable portions of those documents, must be withheld to protect the deliberative processes or the physical safety of our state governors. By holding that the public has no right to know the identity of persons with whom a governor has met, the majority expands the deliberative process privilege well beyond its proper ambit and disregards the wisdom of the federal courts and legal commentators. I would hold that neither the deliberative process privilege, nor concern for the physical safety of our governors, nor the two combined, justifies a blanket exemption for a governor's personal appointment calendars and schedules. I therefore would affirm the judgment of the Court of Appeal.

Broussard, J., concurred.