[No. G003192. Fourth Dist., Div. Three. Oct. 31, 1986.]

FREEDOM NEWSPAPERS, INC., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
COUNTY OF ORANGE et al., Real Parties in Interest.

**COUNSEL**

Duffern H. Helsing, Mark Wray and Helsing & Rockwell for Petitioner.

Crosby, Heafey, Roach & May, John E. Carne, Judith R. Epstein and Alison M. Hightower as Amici Curiae on behalf of Petitioner.

Lascher & Lascher, Edward L. Lascher and Wendy C. Lascher for Respondent.

Adrian Kuyper, County Counsel, Richard D. Oviedo, Deputy County Counsel, Merwin, McDonald & Kopeny and William J. Kopeny for Real Parties in Interest.

**OPINION**

**CROSBY, J.**—In this proceeding for writ of review under the California Public Records Act, we conclude our power is limited to a consideration of the superior court's jurisdiction to deny access to the public records sought. Because we find no want of jurisdiction in that court to make the challenged order, we must deny the writ notwithstanding the view of a majority of this panel that the ruling was erroneous.

I

Randy Kraft is awaiting a capital trial for murder (People v. Kraft, Super. Ct. Orange County, No. C-52776). He is charged with 16 homicides, and the prosecution has also filed a notice of aggravation disclosing an intent to present penalty phase evidence linking him to 22 others. The case has been pending for several years, and three court-appointed and publicly paid private attorneys are currently preparing his trial defense.

The Kraft prosecution has been the subject of relatively intense local newspaper coverage, and the honor of the sobriquet generally conferred on alleged serial murderers has not been denied him. News reports frequently describe Kraft as the "accused 'Freeway Killer.'"

A reporter researching a story for The Orange County Register, a daily newspaper with one of the largest circulations in the state, sought access to records of the Orange County Auditor-Controller reflecting court-ordered payments to Kraft's lawyers and investigators. His request was denied based on a 1985 superior court order sealing all records of payments relating to Kraft's defense.

The Register then brought a petition to require disclosure under the California Public Records Act (Gov. Code, § 6250 et seq. (CPRA)). The auditor-controller and Kraft's attorneys filed written opposition, and a hearing was held. The petition was denied. The superior court based its decision on three alternative grounds. It first found the legislative intent in adopting CPRA "was to ensure . . . that the interests of a fair and impartial trial should adhere to any particular capital defendant charged before this court, and that that interest takes priority over the public's right to know."

Another concern was that the prosecution might gain some insight into defense tactics or strategy: "The court also feels that, any way we approach this problem, that necessary inferences and rational inferences can be drawn from the disclosure of gross funds paid out on capital indigent defense cases. [¶] And, even though we granted [The Register] just limited access to these

records . . ., just total amounts paid, the court feels that that is violative of the legislative intent here. Because, I think, from those figures could be extrapolated the scope of the defense as it is being prepared on behalf of any particular defendant. And I think that would have possible adverse consequences upon safeguarding the ability of the court to provide a fair trial for a particular defendant or defendants, plural."

After noting The Register would eventually have an absolute right to review the record when the prosecution concludes, the judge added a final ground for denying the petition: "If I were to rule otherwise, it's the considered opinion of this court that it would be very difficult to provide a fair and impartial trial to the defendant, in the Randy Kraft case, specifically. [¶] I don't wish to continue about other pending criminal capital cases upon which I don't have any personal knowledge as to what the circumstances are. Although I think the rational inference is that this would also affect the ability of the court to provide a fair and impartial trial on those defendants, also."

In our original disposition of this case, we ruled for The Register in a divided opinion with respect to disclosure of attorneys fees. The majority disagreed with most of the trial court's conclusions on that question, although Justice Wallin would have upheld the judgment on the merits. For example, the majority rejected the notion of automatic prejudice by media disclosure of factual material concerning the alleged crimes or the progress of the prosecution. Relative to what had already been revealed in the media concerning the case, the majority also found it highly unlikely Kraft could be prejudiced by mere disclosure of the cost to the public of underwriting his defense: The press had already repeatedly reported details concerning the brutality and homosexual nature of the alleged offenses and that Kraft was stopped on a freeway while operating an automobile in which one of the victims was found dead, or near death, in the passenger seat.

The majority also rejected the possibility that publication of raw figures of sums paid to attorneys could impermissibly provide information that would somehow "lighten the prosecution's burden of proving its case in chief." (*Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673].) In a matter as serious as this, concluded the majority, defense counsel would obviously engage in extensive preparation for trial; disclosure of the total fees paid could not possibly provide useful information to the prosecution. (As to investigation and expert witness fees, we determined otherwise and upheld the statutory ban on release of that information (Pen. Code, § 987.9).)

Nevertheless, on petition for rehearing Kraft made for the first time an argument which required us to reconsider and will now mandate a contrary

result. He contended, and we will agree, our original opinion exceeded the statutory scope of review, i.e., that we are confined to a determination of jurisdiction and not permitted to intervene based merely on a perceived error of law.

## II

As Kraft pointed out, in 1984 legislation was adopted which speeded appellate review, but severely limited its scope. A line was added to Government Code section 6259, subdivision (c) providing, "In an action filed on or after January 1, 1985, an order of the court, either directing disclosure by a public official or supporting the decision of the public official refusing disclosure, is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of the extraordinary writ of review as defined in Section 1067 of the Code of Civil Procedure." Code of Civil Procedure section 1067 states, "The writ of certiorari may be denominated the writ of review."

The difficulty is this: Code of Civil Procedure section 1068 explains when a writ of review or certiorari may be granted; and that is, to put it bluntly, not very often: "A writ of review may be granted by any court, except a municipal or justice court, when an inferior tribunal, board, or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board, or officer, and there is no appeal, nor, in the judgment of the court, any plain, speedy, and adequate remedy."

Division Two of this court found itself in a similar legal position in *Brown Co.* v. *Appellate Department* (1983) 148 Cal.App.3d 891 [196 Cal.Rptr. 258]. There it was held, "Despite the fact the decision of the appellate department is legally erroneous, we are belatedly persuaded that we are without jurisdiction to annul the decision in this review (certiorari) proceeding." (*Id.,* at p. 903.) Mere legal error does not constitute an excess of jurisdiction; for as *Brown* noted, "The power of the court should not be confused with the duty of the court. While the court has the duty in any case before it to decide correctly, implied in that duty is the possibility the court may decide wrongly. Its jurisdiction, or power to decide, is not in any way defeated or limited by a wrong decision." (*Id.,* at p. 904; see also *Moffat* v. *Moffat* (1980) 27 Cal.3d 645, 656 [165 Cal.Rptr. 877, 612 P.2d 967].)

The meaning of the word "jurisdiction" has different connotations in the law in general and even with respect to writs of review in particular. For

example, the Legislature has, in effect, expanded the scope of the writ by statute in certain special proceedings, such as those before the Agricultural Labor Relations Board, the Alcoholic Beverage Control Appeals Board, and the Workers' Compensation Appeals Board, to provide for a substantial evidence review based on the record as a whole. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343 [156 Cal.Rptr. 1, 595 P.2d 579]; *Kirby* v. *Alcoholic Bev. etc. Appeals Bd.* (1972) 7 Cal.3d 433, 436 [102 Cal.Rptr. 857, 498 P.2d 1105]; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432].) No similar expansion of the statutory language appears in CPRA.

The Legislature's determination was an informed one. We have examined the legislative history of the substitution of the writ procedure for the appellate process, and it is clear both houses were cognizant of the ramifications of the change. Ironically, the bill which accomplished it, Senate Bill No. 2222, was inspired by The Register's corporate owner, Freedom Newspapers, Inc., and sponsored by the California Newspaper Publisher's Association. Among the comments in the summary prepared for the Senate Committee on the Judiciary appears the following: "The sponsors of this bill seek to correct an injustice they perceive due to Orange County's delaying tactics, as well as the potential for other public agencies to delay the disclosure of public documents.[1] However, CSAC [County Supervisors Association of California] has expressed concern that the sponsors may be intentionally destroying a remedy that either party may want to use for the future. A newspaper in another case might conclude that it would have had a better chance at getting the information disclosed if it appealed and received a full hearing, rather than bringing an extraordinary writ of review which could be summarily denied. And public entities are also concerned that they have a full hearing on appeal (as well as the benefits of delay)." (Summary, Senate Com. on Judiciary (1983-1984 Reg. Sess.) pp. 3-4.) Similar language appears in the memoranda of the Assembly Judiciary Committee. Consequently, the Legislature was both wary and informed when it acted; and it adopted a scheme urged by The Register itself.

We are left, then, with the general rule: "Certiorari, like prohibition, is, of course, a 'jurisdictional' writ. While it cannot be used to attack an error of a lower tribunal committed in the exercise of its jurisdiction, it is available when that tribunal has acted in excess of its 'jurisdiction.' [Citations.]" (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d

---

[1]The reference is to *Register Div. of Freedom Newspapers, Inc.* v. *County of Orange* (1984) 158 Cal.App.3d 893 [205 Cal.Rptr. 92], a case in which the Register prevailed after legal proceedings lasting almost two years.

450, 454 [20 Cal.Rptr. 321, 369 P.2d 937].) *Auto Equity Sales* also explains that jurisdiction includes more than simple power over person and subject matter. In the present context it means an act exceeding the power of the court, whether defined by the Constitution, a statute, or a court-developed rule under the doctrine of stare decisis. (*Id.,* at p. 455; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].)

■ Can the use of the stare decisis rubric provide a basis to vacate the judgment of the superior court here? For several reasons we believe not. In *Auto Equity Sales* the appellate department of a superior court declined to follow a controlling decision of the Court of Appeal because "'it is the opinion of this Court that the decision [of the Court of Appeal] is erroneous.'" (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at p. 455.) That, of course, amounted to a defiant rejection of binding precedent from a higher court. Here, however, as in *Brown,* "The [court] attempted conscientiously to follow the law. Its conclusions were wrong [in the opinion of a majority of this panel] but there is no basis for annulling its decision by a writ of review." (*Brown Co.* v. *Appellate Department, supra,* 148 Cal.App.3d 891, 904; cf. *Dvorin* v. *Appellate Dept.* (1975) 15 Cal.3d 648, 650 [125 Cal.Rptr. 771, 542 P.2d 1363].)

■ The Register makes no claim the court lacked jurisdiction to rule on this petition with respect to the parties or subject matter. Nor does it have a colorable argument that there was any lack of jurisdiction to deny access to the records. The Government Code specifically provides, "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record." (Gov. Code, § 6255; see also *Estate of Hearst* (1977) 67 Cal.App.3d 777, 783 [136 Cal.Rptr. 821].)

The auditor-controller complied with the statutory mandate to the superior court's satisfaction. Whether or not we agree that the claimed threat to the public's interest in providing Randy Kraft a fair trial (and avoidance of possible reversal and retrial) is sufficient to outweigh the right to know how much his defense has cost to date, we have no basis to conclude the court exceeded its jurisdiction in so deciding. No statute or controlling precedent based on CPRA compelled a contrary determination. Consequently, the order must stand unless some overriding constitutional mandate compels a different conclusion.

■ None does. The Register persists in claiming its status as a newspaper somehow gives it a greater right to access under the First Amendment than

the public at large. But that notion is, of course, meritless. (See, e.g., *Register Div. of Freedom Newspapers, Inc.* v. *County of Orange, supra,* 158 Cal.App.3d 893, 900 and cases cited.)

■ A better argument could be based on *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. — [92 L.Ed.2d 1, 106 S.Ct. 2735]. *Press-Enterprise* is the latest in a line of cases recognizing a qualified First Amendment right of public access to criminal proceedings. To establish the right in a particular circumstance, two tests must be satisfied: (1) "[T]he place and process [must have] historically been open to the press and general public." (*Id.,* at 478 U.S. — [at 92 L.Ed.2d 10, at 106 S.Ct. 2740].) (2) "[P]ublic access [must] play[] a significant positive role in the functioning of the particular process in question." (*Ibid.*)

Neither of these criteria is satisfied here. The widespread use of publicly sponsored private defense counsel is a relatively modern feature in the criminal law. It can hardly be said that records of attorneys fees paid have "historically" been open during the pendency of the litigation. We suspect what little history there is would reflect a wide disparity on that question across the country.

Also, public access before a particular matter is concluded would not add a significant positive benefit to the functioning of the process itself, whether that process is viewed as the defense of a particular indigent, the cost benefits of this specific prosecution, or the functioning of the system of public support for indigent defense in general.

As this case illustrates, the indigent in a celebrated case will almost certainly opt for confidentiality. If he does not want it, of course, he is not bound to move to seal the records as Kraft did here.

To the extent The Register wishes to engage in a cost-benefit analysis of the Kraft prosecution itself, which we will assume would constitute a significant public benefit, inclusion of defense-attorney-fee information might theoretically be of assistance, but only theoretically. Most of the cost is already public, i.e., the salaries of the prosecutors, investigators, secretaries, and forensic experts in the crime laboratory. The Register also knows three veteran defense attorneys are engaged virtually full time in the representation of Kraft; it does not need specific figures to suggest that their billings will be of considerable magnitude. If, on the other hand, disclosure of fees paid defense counsel to date had more than a theoretical significance and, for example, sparked a strong public outcry, the trial court would be vindicated on the merits; for Kraft would be prejudiced by the disclosure. The right of access recognized in *Press-Enterprise* is not absolute; "the trial court

must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access." (*Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. at p. —, [92 L.Ed.2d at p. 11, 106 S.Ct. at p. 2741].) The trial court has done that; thus, to the extent The Register urges the public importance of the information it seeks, in this particular its claims prove too much.

With respect to the functioning of the system of public support of indigent defense in general, it strains the imagination to believe that release of the amounts of fees paid in one isolated case *before it has been concluded* would provide a significant public benefit. The records of virtually all other cases, pending and closed, are available for The Register's review and critical analysis. They should be adequate for the purpose of public evaluation of the overall system, at least for the present.

The peremptory writ is denied. The alternative writ is discharged. All parties shall bear their own costs.

Trotter, P. J., and Wallin, J., concurred.

Petitioner's application for review by the Supreme Court was denied January 21, 1987.